UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 21 CR 16 |
| Plaintiff, | ) | |
| | ) | U.S. Magistrate Judge Gabriel A. Fuentes |
| v. | ) | |
| | ) | |
| LOUIS CAPRIOTTI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

At a detention hearing held on January 21, 2021, the Court granted the government's motion to detain Defendant Louis Capriotti ("Defendant") pending his trial on a felony charge of transmitting threats by interstate commerce in violation of 18 U.S.C. § 875(c). The Court found that the government met its burden of establishing, by clear and convincing evidence, that no release condition or combination of conditions will reasonably assure the safety of the community, 18 U.S.C. § 3142(e), for the reasons stated in open court and upon an application of the Bail Reform Act's factors for judicial consideration per Section 3142(g) of the Act. This opinion more specifically explains the Court's reasoning.

## BACKGROUND

Defendant's arrest in this matter occurred after government investigators used subpoenaed telephone subscriber and cellular location records to identify Defendant as the person who left a threatening message on December 29, 2020 on the voicemail of a member of the United States House of Representatives from the State of New Jersey. Complaint ¶¶ 19-23. The Complaint stated that the voicemail message related that if "certain persons," in the words of the Complaint, believe that, in the words of the voicemail message, "Joe Biden is going to put his hand on the

Bible and walk into that f------[1] White House on January 20th, they're sadly f------ mistaken," in that Defendant was a "nine-year Marine, active duty." *Id.* ¶ 20. The message, an excerpt of which was played in open court, Govt. Exh. A, further stated that ""[w]e will surround the m------------ White House and we will kill any m------------ Democrat that steps on the m------------ lawn." *Id.* The message also is alleged to have named a former New Jersey governor, whose name was not made part of the record, and stated that Defendant would "like to put one right in [that former governor's] f------ dome." *Id.*

The Complaint further alleged that the December 29, 2020 voicemail was not the first time Defendant used a telephone to threaten federal officials including members of the U.S. Congress. The Complaint alleged that in February 2020, after associating Defendant with what the prosecutor described at the hearing as "dozens" of threatening calls to members of Congress between 2017 and 2020, FBI agents met with Defendant at his home in the south suburbs of Chicago, and at that interview, Defendant acknowledged making the calls that agents played back to him, agreeing that the messages could be interpreted as hateful and threatening. *Id.* ¶¶ 11-12. Defendant is alleged to have told the agents that he meant no "ill will" and was "just f------ with" the members of Congress. *Id.* ¶ 13. The agents nonetheless told Defendant "that he needed to stop making the calls in that manner and indicated that if he continued to do so, he may face charges." *Id.* Yet the Complaint alleged that even after being warned to stop, Defendant "periodically" continued to leave anonymous, threatening messages with members of Congress after February 2020 and into November and early December 2020. *Id.* ¶¶ 14-18. The threatening character of certain of these messages is illustrated by their reference to the caller being a Marine who had "killed" several "terrorists," and that certain of the Congress members who received the messages were

---

[1] The Court has refrained from reciting in full the words that constitute profanity.

Case: 1:21-cr-00016 Document #: 20 Filed: 01/22/21 Page 3 of 12 PageID #:46

"terrorist[s]." *Id.* ¶¶ 16-18.  In a December 2020 message described in the Complaint, the caller added with respect to the intended recipient, a member of Congress from the State of Pennsylvania, "may [that member] choke in hell." *Id.* ¶ 18.  This message also mentioned Vice President Kamala D. Harris, then vice-president elect.  The message is alleged to have stated that to the extent the member believed that "Joe Biden" and "Kamala Harris" were "going to walk into that f------ White House" on "July 20th" (an apparent reference to the inauguration date of January 20, 2021), this belief was mistaken.  *Id.*  The Court takes judicial notice of the fact that on January 6, 2021, as members of Congress were tabulating the electoral votes resulting from the presidential election of November 3, 2020, a violent mob breached the Capitol, causing a temporary delay in the counting of the electoral votes and resulting in a disturbance in which five persons perished, including a Capitol Police officer.

In addition, the information supplied to the Court by Pre-Trial Services, and included in the government's open-court proffer incorporating the Pre-Trial Services report, included a long history of Defendant's having made violent threats and having violated judicial orders of protection.  Specifically, the unrebutted proffer stated that on at least four occasions from 2008 to 2014, Defendant was convicted in Illinois of misdemeanor charges of violating orders of protection.  The proffered information about the conduct underlying these convictions is thin, but it was enough to add to the Court's concern about Defendant having engaged in a pattern of making telephonic threats and about his having been undeterred by judicial orders barring him from making unlawful contact with the person or persons protected under the orders.  The proffer indicated that as to Defendant's first conviction for violating an order of protection, in 2008, Defendant telephoned the person protected under the order, was reminded of the order, and said, "yeah, that's a piece of paper."  The proffer indicated that as to the third such conviction, Defendant

left a "belligerent" voicemail message. As to the fourth conviction for violating an order of protection, in 2014, the proffer indicated that Defendant, by then having been convicted three times for violating orders of protection, contacted the protected person and stated "just because there is an order of protection, it does not matter if I come up to you …. Is that against the law? No it isn't." Subsequently, Defendant was convicted on a state felony charge of telephone harassment in 2015 stemming from an incident in which Defendant violated an order of protection – again – and sent threatening messages to the protected person's father, stating that he would "rip" the protected person's "chest open," and that he would be "coming with guns blazing." For this offense, an Illinois court imposed a sentence of 24 months of probation in October 2016, and although that probation was terminated satisfactorily in October 2018, the record is not clear as to whether the Illinois authorities were aware that beginning in at least 2017, while the probation remained active, Defendant was making telephonic threats to members of Congress in voicemail messages he is said in the Complaint to having admitted he left.

## DISCUSSION

### I. Legal Background: Detention and Release Under the Bail Reform Act

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, a defendant may be detained in custody pending trial "[i]f, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The judicial officer's conclusion that no conditions of release can reasonably assure the safety of other persons and the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). The Bail Reform Act generally expresses a "preference for release," in that Section 3142(e) requires the Court to consider the possibility of

less restrictive alternatives to detention. *United States v. Fattah*, 351 F. Supp. 3d 1133, 1136–37 (N.D. Ill. 2019) (citing *United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991)). "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). In determining whether there are conditions of release which will reasonably assure the safety of any other person and the community, courts take into consideration the following factors set forth in Section 3142(g):

> (g) **Factors to be considered.**—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
> A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). If the judicial officer determines that no release conditions or combination of conditions will reasonably assure the safety of any other person and the community, the Act is directory: "[T]he judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

In addition, the Act specifies the pre-conditions under which the government may proceed to a detention hearing. These preconditions include cases which "involve[]" a "crime of violence." 18 U.S.C. § 3142(f)(1)(A). In the instant case, the government proffered that Section 875(c), the

5

charged offense here, is a "crime of violence" under the Act, and Defendant initially objected before agreeing, at the detention hearing, that the offense of violating Section 875(c) is a crime of violence under the Act.

## II.     Violation of Section 875(c) Is a "Crime of Violence" Under the Bail Reform Act.

Defendant briefly objected to whether a violation of Section 875(c) for transmission of an interstate communication threatening to kidnap or injure a person is a "crime of violence" under the Bail Reform Act, then withdrew the objection. The same objection was briefed and argued in a 2021 Section 875(c) detention hearing in the District of Columbia, *United States v. Meredith*, No. 21-mj-17 (D.D.C. Jan. 14, 2021).[2] To help clear up any confusion over this question, the Court addresses it briefly.

Relatively few published judicial opinions discuss whether a Section 875(c) violation qualifies as a "crime of violence" under the Act, but the Court has no trouble concluding that it does. The operative definition of crime of violence in the Act is found in Section 3156(a)(4)(A), including among crimes of violence, for purposes of the Act, an offense that has as an element the "threatened use of physical force" against person or property of another – this is the so-called elements clause of the Act's definition of crime of violence. The Court, in relying on the elements clause of the Act, does not consider any of the facts as alleged or proved, but only the elements of the charged offense. *United States v. Yang*, 799 F.3d 750, 752 (7th Cir. 2015). A Section 875(c) violation qualifies as a "crime of violence" under Section 3156(a)(4)(A) of the Act if it has among its elements the threatened use of physical force against another person. The elements of a Section 875(c) violation are (1) the knowing transmission in interstate commerce of a communication; (2)

---

[2] There is no published opinion in the *Meredith* matter at this writing, but this Court has reviewed a transcript of the detention hearing, at which the District Court determined that Section 875(c) is a "crime of violence" under the Act and ordered the defendant's detention.

the communication contained a threat; and (3) the communication was transmitted for the purpose of issuing a threat, or with knowledge that the communication would be viewed as a threat. *United States v. Khan,* 937 F.3d 1042, 1051 (7th Cir. 2019) (citing *Elonis v. United States*, 135 S. Ct. 2001 2008-12 (2015)). Multiple federal courts have held that these elements include the threatened use of physical force, sufficient to qualify a Section 875(c) violation as a "crime of violence" under the Act's elements clause. *See United States v. Santoro*, 359 F. Supp. 3d 122, 127 (D. Me. 2019) (finding that Section 875(c) is a "crime of violence" as defined in Section 3156(a)(4)(A) – the elements clause – of the Act, in that defendant could not explain "how one can threaten to injury the person of another without such a threat implying the use of violent force to do so"); *United States v. Christy*, No. 3:18-CR-223, 2020 WL 2794617, at *3 n.5 (M.D. Pa. May 29, 2020) (finding that Section 875(c) is a "crime of violence" under the elements clause of the Bail Reform Act, citing *Santoro*); *United States v. Kane*, No. 3:20-mj-5054 TLF, 2020 WL 1660058, at *2 (W.D. Wash. Apr. 3, 2020) (same). *See also Tomkins v. United States*, No. 16-CV-7073, 2018 WL 1911805, *10 (N.D. Ill. Apr. 23, 2018) (interpreting Section 876(c), an offense of threatening use of the mails, as a "crime of violence" under the similarly worded ACCA elements clause "[b]ecause the "threat to injure the person of the addressee or of another" necessarily involves the threat to use force – either directly or indirectly – to cause injury to the person, so a conviction under the "threat to injure" prong of Section 876(b) constitutes a "crime of violence") (citing *United States v. Chapman*, 866 F.3d 129, 136 (3d Cir. 2017)).

This Court agrees and finds it impossible to imagine proof of a violation of Section 875(c) without a threat of the use of physical force against a person, given that the statute minimally includes a threat to injure another person. *See Tomkins*, 2018 WL 1911805, at *6 (finding that Section 876(b)'s analogous prohibition against mailed threats to injure or kidnap a person is

7

"divisible," so that the court need only consider, in determining whether the offense qualifies as a "crime of violence," the element of a threat to injure a person). The Court's conclusion that Section 875(c) is a "crime of violence" under the Act because its elements include the threatened use of physical force is distinct from the other conclusions the Court reaches as to whether the government has met its burden as to whether conditions of release will reasonably assure the community's safety, as set forth below.

### III.   The Government Met Its Burden As To Community Safety.

The Court explained at the detention hearing why the Section 3142(g) analysis weighed in favor of detention and satisfied the Court that the government met its burden, by clear and convincing evidence, that no release condition or combination of conditions in this matter will reasonably assure the safety of any other person and the community. In short, the Court's most grave concerns were with the first statutory factor: the nature and circumstances of the offense, which, as charged, involved repeated, explicit threats to inflict injury and even death on several members of the U.S. Congress and upon President Joseph R. Biden Jr. and Vice President Kamala D. Harris, who as of December 29, 2020 had won election to those positions and were awaiting their election to be certified by the formal counting of the electoral votes in the U.S. Congress.[3]

---

[3] The Court also considered the other Section 3142(g) factors, including the weight of the evidence, which often is described as the least important of the factors. *See United States v. Radick*, No. 05 CR 798-2, 2006 WL 436116, at *2 (N.D. Ill. Feb. 17, 2006). But this factor may have greater significant in individual cases and factual settings. *United States v. O'Donnell*, No. 20 CR 260, 2020 WL 3058098, at *7 (N.D. Ill. June 9, 2020). The instant matter is such a case because of the importance of the nature and circumstances of the charged offense, i.e., the first of the Section 3142(g) factors. The weight of the evidence in this case is strong, and that supports the gravity the Court places in the offense's nature and circumstances involving, as they do, threats of harm to specific individuals including elected officials all the way up to the President and Vice President of the United States. The Court also considered the personal history and characteristics of Defendant: In this case, his record includes repeated violation of judicial orders of protection crafted for the protection of (a) specific person(s), and as the Court stated at the hearing, his unwillingness or inability to abide by such court orders raises large concerns about whether a release order – compelling him to abide by all laws and stop threatening people – will protect the community from more threats. In addition, the proffered evidence here included a visit from the FBI to Defendant's home in February 2020, whereupon the agents told Defendant that if he did not stop making threatening phone calls or leaving threatening

The events of January 6, 2021 stand as an abject demonstration of the harm that can be done, not just to individuals, but to the institutions of U.S. democracy when incitements to violence transform into actual violence. Here, the government alleged no actual physical harm or violence upon anyone from Defendant. Defendant did not travel to Washington, D.C. on or about January 6 or on any other relevant date, and he is not alleged to have participated in the kind of violence that nation saw on January 6. Nor is he alleged to have incited such violence. Rather, he is charged based on an individual threat left by voicemail with the New Jersey member of Congress on December 29, 2020, containing explicit threats to President Biden, Vice President Harris, and to the unnamed former governor of New Jersey. Accordingly, at the detention hearing, the defense argued that with no evidence of Defendant having intended to act upon that threat, the government had not met its burden on community safety. The Court is writing further on this case to explain what it meant at the detention hearing when it said that aside from whether any evidence shows an intent to act upon violent threats, the making of the threats themselves represent a harm to the

---

messages, he may be facing charges. The Court has a difficult time imagining a greater deterrent to criminal conduct than FBI agents visiting a person's home and telling him or her that charges may be lodged if the person continues the criminal conduct. Yet that visit did not deter Defendant, according to the Complaint. Consequently, the Court has an even greater difficulty imagining that a release order issued by this Court will reasonably assure the safety of the community from further threats. These considerations also bear upon the fourth Section 3142(g) factor, namely the nature and seriousness of danger to any other person or the community that would be posed by Defendant's release, as the Court cannot conclude that a release order would reasonably protect the community from Defendant's ongoing, threatening calls to federal officials, which the government says date back to 2017, when he was already on probation for a felony telephone harassment conviction. Courts applying the Section 3142(g) analysis have ordered detention in other Section 875(c) cases in analogous circumstances. *See United States v. Waldman*, No. 18-MJ-4701 (SN), 2018 WL 2932927, at *3 (S.D.N.Y. 2018) (detaining defendant charged with Section 875(c) where threats were repeated over four years and "multiple court orders … have been ineffectual in dissuading him from threatening and intimidating the victim"); *United States v. Davis*, No. 2:14-mj-451, 2014 WL 12708933, at *1-3 (E.D. Va. Oct. 27, 2014) (detaining Section 875(c) defendant whose threats targeted an attorney, a detective, and a prosecutor, were "replete with profanity," and threatened the welfare of one victim's family).

community, so that without reasonable assurance that the threats themselves will stop upon release, the Court cannot issue a release order.

The Court's decision depended not on whether Defendant had any intent to carry out his threats. The decision depended on the fact that the threats themselves were harmful. Threats, particularly those as explicit, graphic, and repeated as those alleged in this case, harm people. They terrorize people. They affect the safety, security and well-being of people. They induce fear. The Court's conclusion in this respect is not new at all, but the grounds for it bear repeating during these turbulent times. The long-held principle that threats are not constitutionally protected speech arises from a judicial determination that "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571-72 (1942). The Supreme Court in *Chaplinsky* described constitutionally unprotected "fighting words" as among words "which by their very utterance inflict injury, so that any social benefit from their utterance is "outweighed by the social interest in order and morality." *Id.* at 572.

And so do threats. "Pertinent definitions of threat all revolve around a single theme: an expression of an intent to inflict loss or harm." *United States v. Doggart*, 903 F.3d 506, 510 (6th Cir. 2018) (citing, among other authorities, the threat definitions contained in the *Oxford English Dictionary*, *Webster's Second*, *Webster's New International Dictionary*, and *Black's Law Dictionary*). "For if an individual makes a true threat to another, the government has the right, if not the duty, to 'protect[ ] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur ….'" *United States v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012) (quoting *R.A.V. v. City of St. Paul,* 505 U.S. 377, 388 (1992)). *See also United States v. White,* 670 F.3d 498, 507 (4th Cir. 2012) ("true threats have the

10

potential to cause such harm and imperil the security of individual citizens"); *United States v. Haddad*, No. 09 CR 115, 2014 WL 1493152, at *3 (N.D. Ill. Apr. 16, 2014) ("True threats always fall outside the ambit of First Amendment protections, *see R.A.V.,* 505 U.S. at 388, because they inflict injury by their very utterance.") (internal quotations omitted).

Magnifying the Court's concern over the harm inherent in the threats alleged in this case is the fact that their targets included not only members of Congress and a former governor, but also the now-sitting President and Vice President of the United States. *See Watts v. United States,* 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him [or her] to perform his [or her] duties without interference from threats of physical violence.") Moreover, true threats "necessarily contribute" to "a climate of violence" that the community, along with the nation at large, has an important, ongoing interest in reducing. *United States v. Kelner*, 534 F.3d 1020, 1026 (2d Cir. 1976).

> As a part of the Government's constitutional responsibility to insure domestic tranquility, it is properly concerned in an era of ever-increasing acts of violence and terrorism, coupled with technological opportunities to carry out threats of injury with prohibiting as criminal conduct specific threats of physical injury to others, whether directed toward our own or another nation's leaders or members of the public.

*Id.* The late Justice Powell put it this way:

> One of the hallmarks of a civilized society is the level and quality of discourse. We have witnessed in recent years a disquieting deterioration in standards of taste and civility in speech. For the increasing number of persons who derive satisfaction from vocabularies dependent upon filth and obscenities, there are abundant opportunities to gratify their debased tastes. But our free society must be flexible enough to tolerate even such a debasement provided it occurs without subjecting unwilling audiences to the type of verbal nuisance committed in this case. The shock and sense of affront, and sometimes the injury to mind and spirit, can be as great from words as from some physical attacks.

*Rosenfeld v. New Jersey*, 408 U.S. 901, 909 (1972) (Powell, J., dissenting).

## CONCLUSION

The threats as alleged in this case represent, in and of themselves, a distinct harm to the community. The Court is ordering Defendant's detention out of a concern that the risk to community safety stems from the risk that he will communicate more threats, and the government met its burden of showing, by clear and convincing evidence, that no release conditions or combination of conditions will reasonably assure the safety of the community in light of that risk.

**SO ORDERED.**

        **ENTER:**

        */s/ Gabriel A. Fuentes*

        **GABRIEL A. FUENTES**
        **United States Magistrate Judge**

**DATED:**     **January 22, 2021**