IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 21 CR 16 |
| v. | ) | |
| | ) | Judge Ronald A. Guzman |
| LOUIS CAPRIOTTI | ) | |

## LOUIS CAPRIOTTI'S SENTENCING MEMORANDUM

Louis Capriotti, by the Federal Defender Program and its attorney, Jack Corfman, submits this sentencing memorandum in support of his request for a sentence of 18 months, to be followed by 36 months of supervised release.

### I. Mr. Capriotti's Arrest, Offense Conduct, and History and Personal Characteristics, 18 U.S.C. 3553(a)(1)

On January 6, thousands of individuals attacked the United States Capitol, interrupting certification of the 2020 election, injuring over 100 law-enforcement officers, and causing over $1.4 million in property damage.[1] On January 10, the government obtained a warrant for Mr. Capriotti's arrest, which they executed on January 12. Mr. Capriotti's conduct is in stark contrast to these circumstances that preceded (and likely precipitated) his arrest.

Agents found Mr. Capriotti in his home with his mother in a Chicago suburb, where had been living for the last five years. PSR ¶ 106. They did not find weapons of any kind; not handguns or rifles or hunting knives. PSR ¶ 10. They learned he

---

[1] https://www.washingtonpost.com/local/legal-issues/capitol-riot-defendants-pay-damages-restitution/2021/06/03/74691812-c3ec-11eb-93f5-ee9558eecf4b_story.html

did not go to D.C. on January 6, and that he was not talking to anyone else about January 6, or to anyone else about anything in his threatening voicemails. *Id.* He had no intent, and no plan or ability, to follow through on his voicemails. In fact, Mr. Capriotti's voicemails concerned inauguration, not January 6, and that inauguration took place without incident. The reality is that Mr. Capriotti has no affiliation with any groups or other individuals, and the genesis of his actions are much simpler: when he would hear things he didn't like on the news, he would become upset and lash out. PSR ¶ 10.

The government knew this. In February of 2020, Mr. Capriotti participated in a voluntary interview with the FBI, where he admitted to making earlier, uncharged phone calls. After a full interview, including Mr. Capriotti's statement that he understood the agents' concerns and his own explanation that he had no intention or ability to follow through, the agents gave him a warning. They did not arrest him or bring charges.

Our current political rhetoric has led to widespread use of harsher, more inflammatory language. This hyperbolic language has increasingly blurred the boundaries between what is appropriate, what might be improper or insensitive but lawful, and what crosses the line. For example, the left-wing comedian Kathy Gifford once conducted a mock beheading of then-President Trump, while conservative websites may use violent language against political opponents.[2] This is

---

[2] *See* Violent Rhetoric Grew More Mainstream in Conservative, Intellectual Circles, NPR, (Jan. 28, 2021), https://www.npr.org/2021/01/28/961470082/violent-rhetoric-grew-more-mainstream-in-conservative-intellectual-circles; Menace Enters the Republican Mainstream, The New York Times

no excuse for Mr. Capriotti's conduct, which he has acknowledged crossed the line. Yet he did not do so in a vacuum, divorced from the political and news contexts around him; he did so with the news on his television.

As detailed in the PSR and Plea Agreement, Mr. Capriotti has accepted responsibility, acknowledged the harmfulness and wrongfulness of his action, and pleaded guilty to sending a threatening communication in interstate commerce. Specifically, he placed voicemails to congressional offices where he stated that he would shoot any Democrat, including Joe Biden or Kamala Harris, trying to enter the White House on inauguration day. Several of the voicemails contained the statement that he was a veteran trained to kill terrorists. He called congressional offices—not the offices of Joe Biden or Kamala Harris or former governors—and then left voicemails there. From Capitol Police reports, it appears that there is a preexisting process for calls like Mr. Capriotti's, not exclusive to him: voicemails were usually listened to by an intern or lower level staffer, who passed it on to a higher level staffer who passed it onto the Capitol Police. It is doubtful that these voicemails ever reached the named threatened individuals.

Of course, Mr. Capriotti is not a veteran and has never served in the military or any form of law enforcement. He has lived his entire life in the Chicago area, PSR ¶¶ 98, 106, has no FOID card, and has never owned a gun, PSR ¶ 107. Although he would work intermittently, including as a car salesman and for his uncle's asphalt company, he has been unemployed for the last five years. PSR ¶

---

(November 16, 2021), https://www.nytimes.com/2021/11/12/us/politics/republican-violent-rhetoric.html.

121–24. He was a regular cocaine user for approximately ten years when he was younger, and has now been sober for over a decade. PSR ¶ 116. He also had an unhealthy relationship with gambling when he was younger. PSR ¶ 113. Nonetheless, today he remains very close with his mother and his daughter, and he hopes to be able to help support them after he is released.

### II. Mr. Capriotti Does Not Object to the Presentence Investigation Report's Calculation of the Sentencing Guidelines

Mr. Capriotti does not object to the Guidelines calculation in the PSR. According to the PSR, the total offense level is 17, with a criminal history category of III, for an advisory Guidelines range of 30 to 37 months. However, Mr. Capriotti notes that the PSR inserted the official victim enhancement, § 3A1.2(b), that was not contemplated by the parties when entering into the plea agreement in this case. Mr. Capriotti does not contest that this enhancement applies, even though he did not plead to 18 U.S.C. § 115(a)(1)(B), the statute for threatening public officials, but rather 18 U.S.C. § 875(c) for threatening communications generally. The plea agreement, signed with the government, does not contain this enhancement and suggests a Guidelines range of 15 to 21 months, much closer to what an appropriate sentence might be after accounting for all the circumstances. Dkt. 50

### III. The Official Victims Enhancement Overstates the Severity of Mr. Capriotti's Conduct, 18 U.S.C. § 3553(a)(1)

While Mr. Capriotti does not dispute the technical application of the 6-level enhancement, this enhancement substantially overstates the relative seriousness of his conduct. Within the structure of the Guidelines themselves, it is geared towards

4

imposing harsher penalties for violent physical conduct that is more serious than Mr. Capriotti's voicemails, and even on its own terms the six-level enhancement overstates the seriousness of Mr. Capriotti's calls.

Section 875(c) is governed by § 2A6.1 of the Guidelines, and so the official victim enhancement in this case triggers not the regular three-level enhancement but a six-level one, for an official victim of a "Chapter Two, Part A (Offenses Against the Person)" offense. U.S.S.G. 3A1.2(b); *see* § 2A6.1. But § 3A1.2(c) of the Guidelines suggest that the same six levels would be given as an enhancement if Mr. Capriotti had in fact physically assaulted someone in a way that risked causing serious bodily injury. *See* U.S.S.G. 3A1.2(c). While serious, Mr. Capriotti's voicemails, largely left for third-party elected officials who were not threatened, are simply not equivalent to a physical assault with a risk of serious bodily injury. The Guidelines provide for identical six-level enhancements because the majority of Chapter Two, Part A offenses are *also* offenses that result in physical harm, rather than threats. They are physically violent crimes like homicide, § 2A1.1, aggravated assault, § 2A2.2, criminal sexual abuse, § 2A3.1, kidnapping, § 2A4.2, and air piracy, § 2A5.1.

But Mr. Capriotti—who was a known quantity to the FBI even before his arrest due to his voluntary interview—simply has never posed a danger of carrying out his threats, and the officials who were the focus of them likely never heard them and knew little, if anything, about them. Mr. Capriotti submits that his relative culpability within the context of the Guidelines would have been better captured by only the three level increase, § 3A1.2(a), which would place him at offense level 14

5

for a range of 21 to 27 months, further supporting his request for a below-guideline sentence.

Finally, the government itself, with an understanding of the case at the change of plea stage and a longstanding familiarity with Mr. Capriotti, was comfortable with a range of 15 to 21 months. Mr. Capriotti acknowledges that original range and calculation are nonbinding. But binding or not, the government's signature to a plea agreement with a lower guidelines range is another factor in support of a below Guidelines sentence.

### IV. A Sentence of 18 Months is Appropriate in Comparison to Other Cases, 18 U.S.C. § 3553(a)(6)

Those who have been sentenced to their role in the Capitol attack have largely been given very light sentences—probation or short periods of incarceration or home detention. *See* Exh. A (List of Capitol participants who have been sentenced). This is so even though these individuals planned and carried out travel from their homes to Washington, D.C., attended a mass gathering there, walked from the original gathering point to the U.S. Capitol, and then entered the Capitol—the very heart of our government—unlawfully, and stalled an important proceeding in our government's transfer of power.

According to a recent sentencing table filed by the government in another case, approximately 101 defendants who have been sentenced for being at the Capitol received either probation or short terms of up to a few months of incarceration. *See* Exh A. Only seven so far have received sentences of substantial prison time at all comparable to Mr. Capriotti's guideline range as calculated in the

6

PSR and recommended by probation, despite having been physically present at the Capitol. Those seven are all defendants who both (1) went to the Capitol on January 6 and (2) also committed a further serious crime, such as making threats or physically assaulting an officer. *Id.* at 7, 8, 9, 10, 12.

Mr. Capriotti does not claim to equate his conduct with those at January 6 in. He does not dispute that his conduct is more serious than an individual person who wandered into the Capitol unlawfully—even if the crowd as a whole had a much greater impact on our government than Mr. Capriotti did. But by the same token, Mr. Capriotti is much less culpable than those defendants who committed other crimes, such as threats, violence, or incitation, and actually traveled to Washington, D.C. to participate. The physical invasion of the U.S. Capitol is more aggravating, and more threatening, than Mr. Capriotti's phone calls from his house in Chicago.

For example, Troy Smocks traveled from Texas to Washington, D.C., and on January 6 used social media to send threatening messages, including that others should "Prepare Our Weapons, and then go hunting" and urged them to "hunt these cowards down like the Traitors that each of them are." *United States v. Troy Smocks*, 1:21CR198 (D.D.C.), Dkt. 53. He pleaded guilty to one count of 18 U.S.C. § 875(c), just like Mr. Capriotti, and received a sentence of 14 months.

Cleveland Meredith drove from Colorado to Washington D.C., and while there sent a message to someone else that he was thinking about "putting a bullet in [Nancy Pelosi's] noggin on Live TV." *United States v. Cleveland Meredith*, 1:21CR159 (D.D.C.), Dkt. 47. In the trailer Mr. Meredith drove to his hotel in D.C.,

7

law enforcement found a handgun, a rifle, 2,500 rounds of ammunition, and 10 large capacity ammunition feeding devices. *Id.* The Court imposed a sentence of 28 months.

Dawn Bancroft entered the U.S. Capitol on January 6, and afterwards filmed a video of herself where she said that she was "looking for Nancy [Pelosi] to shoot her in the friggin' brain but we didn't find her." Notwithstanding the fact that she was standing on the Capitol grounds while saying this, immediately after having unlawfully entered the U.S. Capitol to look for the Speaker, Ms. Bancroft was never charged with a threatening communication and pled to a misdemeanor. *United States v. Dawn Bancroft*, 1:21CR271 (D.D.C.), Dkt. 33.

Scott Fairlamb, went to D.C. from New Jersey, unlawfully entered the U.S. Capitol, and assaulted a capitol police officer with the intent of delaying an official proceeding "by intimidation or coercion." *United States v. Scott Fairlamb*, 1:21CR120 (D.D.C.), Dkt. 39. He received a sentence of 41 months, only a few months higher than Mr. Capriotti's guideline range and the PSR recommendation.

While inside the Capitol, Jacob Chansley "used his bullhorn to rile up the crowd," including to "demand that lawmakers be brought out," and repeatedly challenged a lone police officer in front of that crowd. Afterwards, he called being a part of the intimidation of Congress "a win." *United States v. Jacob Chansley,* 1:21CR03 (D.D.C.), Dkt. 70. He, too, was sentenced to 41 months.

In the Eastern District of New York, Brendan Hunt recorded a video on January 8 calling for a return to the U.S. Capitol "with our guns and we need to

slaughter these motherfuckers," and "literally just spray these motherfuckers," and that "I will go there myself and shoot them and kill them." He was convicted after a jury trial of threatening to murder a member of Congress and sentenced to 19 months. *United States v. Brendan Hunt*, 1:21CR86 (E.D.N.Y.), Dkt. 137.

A sentence of 18 months is in line with these cases. There is no doubt that Capriotti's messages were wrong and unlawful, and threatening towards federal officials. But they are substantially less so than those who physically invaded the Capitol and harmed or threatened Congress in the process, and in line with (or even less than) those like Mr. Hunt, who publicly encouraged individuals to return.

## V. The Covid-19 Pandemic Has Meant That Mr. Capriotti's Pretrial Detention Has Been Far Harsher Than Normal

Mr. Capriotti has been detained at Chicago MCC for nearly 15 months, entirely during the Covid-19 pandemic. Not only has he already spent several times longer in jail than ever before, but he has done so during some of the hardest times possible to be incarcerated in living memory. The pandemic has warped the nature of pretrial detention into an unprecedented and harsh reality that requires a reevaluation of what constitutes a just punishment. *See United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (explaining that a sentencing court may account for "the harshness of the conditions" of a sentence). Movement is greatly restricted, including through repetitive 23.5-hour-a-day lockdowns—most recently, but not exclusively, during the a six-week continuous period in December and January. Programming has been extremely limited when it has not been curtailed entirely.

9

Visitation is equally curtailed. And jails and prisons have been the sites of some of the worst Covid-19 outbreaks in the country.

Public health officials have warned since the beginning of the pandemic that inmates are in a uniquely dangerous position.[3] The CDC guidelines are impossible to implement at any penal institution. "Social distancing is especially difficult in jails and prisons. The CDC summarizes these challenges as including crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated or detained persons, transport of incarcerated or detained persons in multi-person vehicles for court-related, medical, or security reasons." *United States v. Gakhal*, No. 15 CR 470-1, 2020 WL 3529904, at *2 (N.D. Ill. June 30, 2020) (Lefkow, J.). Thus, "because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons." *United States v. Jemal*, No. CR 15-570, 2020 WL 1701706, at *1 (E.D. Pa. Apr. 8, 2020) (citing an affidavit from Dr. Brie Williams, a physician).

While the Covid-19 vaccine has helped, it has not prevented the ongoing risks. The Omicron variant has proven contagious even in vaccinated groups. It caused an outbreak at the Chicago MCC, where Mr. Capriotti is currently detained. Starting on December 21, 2021, the MCC went on a full lockdown in order to contain the spread. To date, approximately 55,486 inmates—nearly 1/3 of the total

---

[3] https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (last visited March 21, 2022).

10

BOP population—have tested positive for coronavirus at some point during the pandemic. *Id.* In other words, the evolving variants and prison conditions have made it impossible for BOP facilities to become "Covid-safe," if such a thing exists. And any further period of incarceration Mr. Capriotti must serve will likely be in the same conditions.

As bad as the virus has been, the efforts required to manage its spread add further burdens. On March 13, 2020, BOP "modified its operations" to respond to the spread of COVID-19. Fed. Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Individuals at BOP institutions have periodically been confined to their cells or quarters for long stretches—sometimes for months at a time, for 23.5 hours a day. These lockdowns are similar to conditions imposed on the most dangerous prisoners housed in BOP Administrative-Maximum Security Penitentiaries,[4] or special housing unit punishments for disciplinary infractions. Mr. Capriotti recognizes that these measures are necessary to attempt to stop the spread of the virus, but there can be no denying that they created an extra punitive effect as well. What the BOP uses as disciplinary measures are the exact same measures the BOP must take to limit the effects of the pandemic, only without fault and for a much longer period of time. *See* 28 C.F.R § 541.3 ("Prohibited acts and available sanctions"). Common sanctions imposed for disciplinary violations are loss of privileges such as visitation,

---

[4] Mark Binelli, *Inside America's Toughest Fedearl Prison*, https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html (last visited March 21, 2021),

11

telephone, or recreation, while more severe violations include disciplinary segregation, all of which are curtailed during the pandemic. *Id.*

Mr. Capriotti's time in pretrial detention has been of unprecedented severity. In fashioning a sentence, the Court should account for this, and, in light of Omicron, the likelihood it will continue. *See, e.g., United States v. Olawoye*, No. 1:15-CR-00172-AA-5, 2020 WL 4559816, at *5 (D. Or. Aug. 7, 2020) ("The sentence defendant has served has undoubtedly been harsher than the one originally contemplated at the time of sentencing."); *United States v. Armstrong*, No. 18-CR-5108-BAS-1, 2020 WL 4366015, at *4 (S.D. Cal. July 30, 2020) (acknowledging in the context of compassionate release that defendants are now receiving lower sentencing recommendations because their time in custody is harsher); *Spano*, 476 F.3d at 479 (finding merit to the argument that "the harsher the conditions the shorter the sentence should be"). Mr. Capriotti's sentence has and will be served under much harsher conditions than a similarly situated individual sentenced before, or after, the pandemic.

## VI. Deterrence is Achieved Here, 18 U.S.C. § 3553(2)(B)–(C)

Of course, the Court is not only concerned with the past, but also the future. The sentence must ensure that Mr. Capriotti does not commit this—or any other crime—again. An 18-month sentence is sufficient to deter Mr. Capriotti because it is nearly 7 times longer than his previous longest sentence. PSR ¶ 56. A guidelines sentence of 30 to 37 months would be over 11 times longer. A sentence of 18 months is a strong message that Mr. Capriotti has crossed a line—and it is a

12

message that he has fully received. Moreover, there is evidence that such deterrence will work: he previously successfully completed his probation from 2016 after his first ever felony conviction, and he has twice voluntarily agreed to speak to law enforcement in this very case without incident.

His past criminal history shares two common threads, both of which can be addressed. First, his prior history almost exclusively revolves around the relationship with the mother of his daughter and his daughter, a situation that is a source of strong emotions for him. But his daughter is now an adult of her own and wrote a letter in support, and so the issue of custody driving that tension is gone. Second, Mr. Capriotti's history is largely for less serious conduct that was always punished only with straight probation or a short amount of local jail time. *See* PSR ¶ 48 (82 days in jail), 51 (28 days), 56 (26 days), 58 (probation). When agents spoke with Mr. Capriotti in 2020, they gave him a warning, not charges and handcuffs. By contrast, Mr. Capriotti has now been charged in federal court—with his name in the newspapers—and is facing well over a year of jail and a guidelines range of much more than that. He has also been seriously injured while in custody, requiring sutures and skin staples. PSR ¶ 110. A sentence of 18 months is a statement of seriousness by the Court, and a warning that Mr. Capriotti will heed.

A sentence of 18 months' imprisonment is also sufficient to demonstrate to the community that crossing the boundaries from emotional disagreement to threatening language is the sure way to lose one's freedom for a significant period of time. The certainty of being caught, rather than the severity of the punishment

13

imposed, is a "vastly more effective deterrent." Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence*, June 5, 2016, https://nij.gov/five-things/pages/deterrence/aspx (last visited March 21, 2022). Empirical research supports this conclusion and shows no clear relationship between sentence length and deterrence. *See, e.g.,* National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, Committee of Causes and Consequences of High Rates of Incarceration, at 342, J. Travis, B. Western, and S. Redburn, Editors (2014) ("research indicates that the large increase in incarceration rates has not clearly yielded sizable reductions in crime."); Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?* 100 J. Crim. L. & Criminology 765, 817 (2010) ("[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity."). This prosecution itself thus has the greatest deterrent effect, and those that might repeat Mr. Capriotti's errors are not likely to be swayed by more severe sentence once a meaningful prison sentence is reached. And, as mentioned above in Part IV, a sentence of 18 months is in line with similar cases.

### VII. Mr. Capriotti Proposes a Supervised Release Condition for an Anger Management Program, and Has One Objection

Mr. Capriotti voluntarily proposes an additional condition of supervised release: that he attend, at the direction of Probation, a program for anger management counseling. He understands that his emotions have gotten him in trouble in the past and that he has spent the last year in jail in part for that reason, and has no interest in repeating his mistakes and going back to the MCC once he is

14

released. Counsel understands that Probation has previously worked with, among other programs, the Way Back Inn, though of course what programs will be available will depend in part on the timing of Mr. Capriotti's ultimate release and require consultation with Probation.

Mr. Capriotti objects only in part to Discretionary Condition #16: Probation Officer Visits, which provides for the probation officer to visit at work or "other reasonable location specified by the probation officer." When Mr. Capriotti starts employment after his incarceration, an unannounced visit from a probation officer may jeopardize that employment. In addition, the term "other reasonable location" is subjective. Mr. Capriotti asks the Court to omit that portion of the condition altogether or to alter it to read "other reasonable location agreed to in advance by defendant and the probation officer." *See United States v. Kappes*, 782 F.3d 828, 848 (7th Cir. 2015) (discussing the need for crucial terms of supervised release to be defined objectively).

**Conclusion**

Mr. Capriotti has been punished—and will continue to be punished—far more harshly than he ever has before, and he has no desire to return to jail ever again. For the reasons stated above, as well as those that will be presented at the sentencing hearing, Mr. Capriotti respectfully requests that this Court impose a sentence of 18 months, to be followed by 36 months of supervised release.

                                        Respectfully submitted,

                                        FEDERAL DEFENDER PROGRAM
                                        John F. Murphy,

Executive Director

By:    /s/ *Jack Corfman*
        Jack Corfman
        Attorney for Louis Capriotti

        Federal Defender Program
        55 E. Monroe Street, Ste. 2800
        Chicago, IL 60603
        (312) 621-8300

Executive Director

By:    /s/ *Jack Corfman*
        Jack Corfman
        Attorney for Louis Capriotti

        Federal Defender Program
        55 E. Monroe Street, Ste. 2800
        Chicago, IL 60603
        (312) 621-8300