UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>LOUIS CAPRIOTTI ) | 21 CR 16<br><br>The Honorable Ronald A. Guzman |

## GOVERNMENT'S SENTENCING MEMORANDUM

Between October 2019 and January 2020, Defendant Louis Capriotti, a 46-year old man with a history of criminal convictions for domestic battery, assault, and violating orders of protection, made a series of threatening phone calls to various Members of the United States Congress. Those calls prompted the FBI to meet with and interview Capriotti in February 2020. During that interview, the defendant acknowledged his voicemails could be perceived as threatening and dangerous, and was advised that such threatening voicemails were federal crimes. Apparently undeterred, Capriotti continued to make threating phone calls to Members of Congress in the fall and winter of 2020. These threats culminated in a December 29, 2020 voicemail to a Member of Congress in which Capriotti stated, "we will surround the motherfucking White House and we will kill any motherfucking Democrat that steps on that motherfucking lawn!" In the same voicemail, Capriotti identified the former governor of the Member's state, and said, "I'd like to put one right in his fucking dome!" Because of the nature and circumstances of Capriotti's offense, his serious and concerning criminal and personal history, and the need to afford adequate

deterrence, the Government requests that the Court impose a sentence of imprisonment of 30 months, which is at the low end of the advisory Guidelines range.

## I. PRELIMINARY ADVISORY SENTENCING GUIDELINES RANGE

As a matter of process, the District Court must properly calculate the Guidelines range, treat the Guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the Guidelines range. *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007).

The government agrees with the Probation Office's determination that the base offense level is 12, pursuant to Guideline §2A6.1(a)(1). PSR ¶ 17.

The government agrees that the offense level increases by 2 levels pursuant to Guideline § 2A6.1(b)(2)(A), because the offense involved more than two threats. PSR ¶ 18.

The government also agrees that the offense level increases by 6 levels pursuant to Guideline § 3A1.2(b) because the offense involved victims who were current and former elected officials and the offense was motivated by the victim's status as a government officer. PSR ¶ 19.

Finally, the government agrees that the offense level is reduced by 3 levels because of the defendant's timely acceptance of responsibility, pursuant to Guideline §§ 3E1.1(a) and (b). PSR at ¶¶ 24, 25.

The government agrees with the Probation Office that defendant's criminal history points equal 4 and place him in Category III. PSR at ¶ 59.

Pursuant to these calculations, the defendant's total offense level is 17, his criminal history category is III, and his advisory Guidelines range of imprisonment is 30-37 months' imprisonment. PSR at ¶133.

The government also agrees that the Court may impose a period of supervised release of up to 3 years. PSR at ¶ 135.

## II. GOVERNMENT'S POSITION ON SENTENCING

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The "Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *see also United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (a "district court that sentences within the Guidelines necessarily gives weight and consideration to avoiding unwarranted disparities."). Although a sentence within the Guidelines is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate sentence.

The Government respectfully submits that a sentence at the low end of the advisory Guidelines range is appropriate in this case.

### A. The Nature and Circumstances of Defendant's Crime and the Need to Reflect the Seriousness of the Offense

Capriotti's crime was a serious offense. Capriotti left a series of threatening voice messages for four different sitting Members of Congress in November and December 2020. In the voice messages, the defendant falsely stated that he was a

3

"nine-year Marine, active duty." GV at 1. The purpose behind that false statement was, in Capriotti's words, to "make 'em think we're legit." GV at 3. Put another way, the purpose was to instill fear. In one voice message, Capriotti falsely stated that he "killed a lot of Muslim terrorists in Afghanistan and Iraq," and referred to the Member of Congress as a "fucking terrorist." GV at 2. Again, the intent of that false statement was to make the Member of Congress fear for that Member's safety. These threatening voice messages culminated on December 29, 2020, when Capriotti again referred to Democrats as terrorists and stated, "we will surround the motherfucking White House and we will kill any motherfucking Democrat that steps on the motherfucking lawn." GV at 2-3. At the end of the voice message, Capriotti identified the former government of the Member's state and said, "you tell that fucking RINO [Republican In Name Only] . . . I'd like to put one right in his fucking dome! He's a fucking traitor!" GV at 3.

Those interstate threats, on their own, are serious crimes. But there is additional context that makes the conduct more alarming and warrants a serious sentence of imprisonment. First, this series of threats was not the first time defendant had engaged in this behavior. Capriotti has been leaving threatening voice messages for various Members of Congress since 2017. PSR ¶ 8. After a series of threatening voice messages between October 2019 and January 2020, FBI agents met with and interviewed Capriotti. GV at 1. During that interview, the defendant acknowledged that his voice messages could be perceived as dangerous threats. He was also advised that his voicemails contained threats and were criminal acts. *Id.*

After that interview, there was no confusion that Capriotti's threats were received and heard by the offices of the Members of Congress, that they were perceived as threats and forwarded to law enforcement, and that they constituted criminal acts. Yet Capriotti continued leaving such messages after the presidential election in 2020. Following a federal election and weeks before a presidential inauguration , the timing of Capriotti's voice messages should not be ignored and only adds to the aggravation here as it pertains to the severity of defendant's crime. Such threats must be taken seriously because they have real implications for the victims (in this case, former and sitting elected public officials) receiving them.

Accordingly, an advisory Guidelines range sentence is appropriate to reflect the seriousness of defendant's offense.

### B. Defendant's History and Characteristics

Capriotti is 46 years old and has a long history of criminal conduct, threatening behavior, and violations of court orders. PSR, ¶¶ 34-118. He has amassed approximately 25 criminal convictions, and 29 additional arrests as an adult. Many of those convictions are for traffic offenses, but they also include concerning convictions for domestic battery, assault, and numerous violations of orders of protection for which defendant was sentenced to both probation and periods of incarceration.

The victim of Capriotti's 2004 domestic battery conviction reported that Capriotti kicked her in the back and slammed her head into a wall. PSR ¶ 42. Because the conviction occurred in 2004, Capriotti does not receive any criminal history points

for this conviction. Five years later, Capriotti was again convicted of domestic battery of a second victim. PSR ¶ 48. According to this victim's report, Capriotti struck her in the face and head several times with his hand and fist, said that he had recently purchased a gun, and threatened to kill her. *Id*. Capriotti received a sentence of 75 days' incarceration for this conviction, but he violated the terms of his probation and the sentence was later increased to 165 days' incarceration. PSR ¶ 48. Because this conviction occurred in 2009, Capriotti does not receive any criminal history points for this conviction.

Capriotti's criminal history is littered with other convictions or arrests involving threats that he made to family members, neighbors, and strangers. His criminal history – especially his convictions for domestic battery – show that Capriotti is capable of following through on his anger and threats. His numerous convictions for violating orders of protection indicate that Capriotti has difficulty following Court orders and instruction. In short, Capriotti's personal history tells the story of a man with lifelong anger problems, a capacity for violence, and a disregard for the law.

Accordingly, Capriotti's history and characteristics support a sentence of 30 months' imprisonment.

    C.    **The Need to Afford Adequate Deterrence and Protect the Public from Defendant**

Defendant's offense warrants a sentence that provides both specific and general deterrence. As Capriotti's criminal history shows, he has difficulty following Court orders and has a history of reoffending while on probation. A guidelines-

sentence would send a message to Capriotti that any further threats to public officials will not be tolerated.

This is also an offense that warrants a significant sentence to afford general deterrence to the public. As Capriotti acknowledges, violent rhetoric has grown more common in recent years. R. 60 at 2-3. But defendant's conduct was not simply rhetoric. He aimed specific threats at Members of Congress and he did so knowingly and intentionally. That conduct is unacceptable and a serious sentence of incarceration will send the message to the general public that it will not be tolerated by Courts.

### D. Conditions of Pretrial Detention

Finally, defendant asks the Court to fashion a sentence in light of the "harsher conditions" of pretrial confinement brought about by the COVID-19 pandemic. R. 60 at 9-12. That argument should be rejected.

As a threshold matter, conditions of confinement are not included in the § 3553(a) factors. Moreover, the Seventh Circuit has been presented with, but has declined to decide, whether even "extraordinarily harsh" conditions of confinement could ever justify a reduced sentence. *United States v. Daoud,* 980 F.3d 581, 598 (7th Cir. 2020) (quoting *United States v. Campos*, 541 F.3d 735, 751 (7th Cir. 2008) (holding that the conditions in which Daoud was held, which included a year spent in segregated housing, did not amount to even "extraordinarily harsh" conditions.) Other courts have held it appropriate to consider pretrial confinement conditions, but only in the most extreme circumstances. *See United States v. Pressley,* 345 F.3d 1205,

1219 (11th Cir. 2003) (defendant spent 5 years in 23 hour a day lockdown at USP Atlanta); *United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001) (defendant was jailed in the Dominican Republic awaiting extradition in a 32 square foot cell with 3-4 other prisoners, with no light, no running water, no toilet other than a hole in the ground, extremely limited access to the telephone, limited time to bathe, and no access to paper, pens, newspaper or radio).

The Seventh Circuit has distinguished *Pressley* and *Carty* based on the conditions in those cases being "so substantial or onerous as to take [the] case out of the heartland of cases." *United States v. Ramirez-Gutierrez*, 503 F.3d 648, 646 (7th Cir. 2007) (quoting *United States v. Dyck,* 334 F.3d 736, 742-43 (8th Cir. 2003) (allegations that defendant was not able to obtain care for his broken tooth, lived in poorly ventilated quarters, and was given inadequate exercise during his 2 ½ month detention was not unusually harsh.).

The defendant's complaints about the conditions of confinement resulting from the pandemic—conditions that are generally-applicable to all inmates—are similar, and in some respects, less serious, than those consistently rejected by the Seventh Circuit as being "extraordinarily harsh" or otherwise sufficient to warrant a reduced sentence. *See Daoud,* 980 F.3d at 598 (year spent in segregation not warrant reduction); *United States v. Turner,* 569 F.3d 637, 642 (7th Cir. 2009) (fact that defendant "not given nutritious food, reasonable medical care, clothing, educational classes, or sanitary conditions in which to live" not warrant reduction); *United States v. Martinez*, 520 F.3d 749, 751 (7th Cir. 2008) (same for defendant confined in pretrial

8

detention for almost two years without—by his account— treatment for a cataract and an ulcer); *United States v. Reddick*, No. 17-3477, 759 Fed.Appx. 512, 513-14 (7th Cir., Feb. 7, 2019) (same for defendant who complained of shorter visiting hours, being incarcerated a long distance from his family, and who got reduced credit for time served); *United States v. Harris*, 383 Fed. Appx. 551, 553 (7th Cir. 2010) (same for defendant who complained of less contact with family, lack of access to the law library, and occasionally overflowing toilets); *United States v. Macias-Martinez*, 344 Fed.Appx. 264, 266 (7th Cir. 2009) (same for defendant who was on lockdown 19 hours a day without access to television for 9 months, as well as an inability to access the funds in his inmate account to buy needed sundries and obtain dental care).

Moreover, the defendant's complaints of worries and fears about contracting COVID-19 are not unique to him either as an inmate or as a member of society at large. Stress and anxiety due to fear of COVID, coupled with the emotional impact of social distancing and other public health measures, continue to exact a toll on the lives of millions of Americans. Such circumstances do not warrant consideration in the context of sentencing for serious crimes.

Finally, even if the existence of the pandemic were a proper consideration in sentencing, it would not outweigh the more compelling goals of sentencing explicitly set forth in § 3553(a), particularly the needs for incapacitation, deterrence, and just punishment resulting from the defendant's repeated violent crimes and the seriousness of his offenses).

9

### III. GOVERNMENT'S POSITION ON SUPERVISED RELEASE

The government has no objections to the conditions of supervised release recommended by the Probation Office, and the government submits that a period of supervised release of two years is appropriate. The government also agrees with the special conditions and discretionary conditions of supervised release, as recommended by the Probation Office. The government does not object to defendant's proposed condition requiring him to attend anger management classes.

### IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant Louis Capriotti to a within-Guidelines term of imprisonment of 30 months, with three years of supervised release.

Date: April 4, 2022

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s *James P. Durkin*
JAMES P. DURKIN
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-6630